## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-cr-00391 (BAH)** |
| **v.** | : | |
| | : | |
| **LEONARD GRUPPO,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the Acting United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Gruppo to thirty days' incarceration and $500 in restitution.

### I.      Introduction

The defendant, Leonard Gruppo, an Army veteran who once rose to the rank of Lieutenant Colonel, and his close friend Kenneth Kelly (Case No. 21-cr-331 (CKK)), participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than a million dollars' worth of property damage.

Gruppo pled guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building.  As explained below, a custodial sentence is appropriate in this case.  Instead of upholding his military oath to support and defend the Constitution, Gruppo disgraced himself and his country by participating in a riot that sought to undermine one of the most fundamental and cherished tenets of our democracy—the peaceful transfer of power.  His 28 years of prior military service renders his participation in the riot more egregious.  Moreover, the

1

defendant deleted evidence of his participation in the riot from his phone, thereby obstructing the government's investigation into his conduct.  Finally, the defendant's remorse did not come when he left the Capitol Building; it came four-and-a-half months later, and only after Kelly, who at that point had already been arrested and charged, urged him to come forward and turn himself in.

Gruppo made a conscious decision to enter the Capitol Building on January 6.  In so doing, he ignored several opportunities to remove himself from the disorder and chaos around him.  For example, instead of leaving the restricted grounds when he noticed the crowd begin to swell in size, he chose to join the fray of rioters who were climbing over a retaining wall and ascending the staircase from the Lower West Terrace to the Upper West Terrace.  Instead of walking away when he noticed officers establishing a perimeter on the Upper West Terrace, he chose to walk *toward* the building.  Instead of turning around when he noticed the broken windowpanes by the Senate Wing door, he chose to enter the building, and to film himself while doing so.  Finally, instead of heeding an officer's advice to exit the Capitol Building through the Senate Wing door behind him, Gruppo chose to turn around and continue walking south through the Capitol.

As this Court has already recognized, the defendant's conduct on January 6th, like the conduct of other defendants, took place in the context of a large and violent riot in which sheer numbers combined with violence to overwhelm law enforcement, allowing rioters to breach the Capitol and disrupt the proceedings.  The riot would not have happened but for his actions and the actions of so many others.  Here, the defendant's participation in a riot that succeeded in delaying the Congressional certification, combined with his prior military service, his efforts to obstruct justice, his delayed remorse, and his failure to heed officer commands and instructions, renders a custodial sentence both necessary and appropriate.

## II.   Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol.  *See* ECF No. 20 (Statement of Offense), at ¶¶ 1-7.  As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent— contributed, directly and indirectly, to the violence and destruction of that day.  The sheer number of people who chose to be a part of this attack on democracy overwhelmed the Capitol despite attempts by law enforcement to fight them off.  Even those who did not attack others, destroy property, or threaten members of Congress themselves supported those who did by joining them. The presence and participation of each and every one of these people encouraged and enabled other rioters as they breached the grounds and the building.



*Figure 1*



*Figure 2*

*Gruppo's Role in the January 6, 2021 Attack on the Capitol*

Gruppo traveled with his wife from Clovis, New Mexico, to Washington D.C., to attend the "Stop the Steal" rally on January 6, 2021.  There, he met up with his good friend and former colleague, Kenneth Kelly.  Gruppo and Kelly attended the rally on January 6 and took a picture together in front of the Washington Monument.  *See* Figure 3, below.

Wednesday 11:04 AM

Ken



*Figure 3*

After former President Trump finished delivering his remarks, Gruppo, Gruppo's wife, and Kelly walked from the Ellipse toward the U.S. Capitol.  According to Gruppo, he arrived at the Capitol approximately one-and-a-half to two hours before ultimately entering the building.  He then stood in the grassy area bordering the northern staircase on the west side of the Capitol Building, as indicated by the red arrow in Figure 4, below.



*Figure 4*

During a debrief with law enforcement, Gruppo maintained that he could not see much from where he was standing.  He admitted to seeing a light blue puff of smoke and a pink puff of smoke, and to hearing individuals on bullhorns urging the crowd to keep moving forward.  He also admitted to seeing a handful of rioters scaling the retaining walls and staircase beside him.  Finally, while the defendant claimed that he did not see any clashes between rioters and law enforcement officers, he admitted to observing rioters, who at one point appeared to be stopped on the staircase, begin moving, en masse, up the stairs to the Upper West Terrace.

In addition to what the defendant admitted to seeing, he also likely would have heard the deafening sounds of flash bangs exploding as nearby rioters at the Lower West Terrace clashed with law enforcement officers.  *See* Figures 1 & 2, above.  Had he looked up, he would have seen rioters being pursued by law enforcement as they climbed the white scaffolding directly above

him.  And he almost certainly would have heard the crowd chanting slogans like, "Our House,"
and "Stop the Steal," as thousands of rioters demanded that officers let them inside the building.

Gruppo eventually joined his fellow rioters and climbed the retaining wall at the bottom of
the northern staircase.  The retaining wall that Gruppo likely climbed is visible in a photograph
that Kelly took on January 6th.  *See* Figure 5, below.



*Figure 4*

Gruppo then ascended the steps to the Upper West Terrace, where he witnessed a large
group of law enforcement officers attempting to establish a perimeter and push the crowd back.
Instead of leaving the premises, Gruppo chose to enter the Capitol Building.

Upon approaching the Senate Wing door, Gruppo could see broken glass.  That is because
approximately 45 minutes prior, rioters wielding weapons and stolen riot shields shattered open
the windows, climbed inside the building, and kicked open the door.  In Gruppo's own words,

"especially when I got close, and I saw the broken [window]panes, you know I [thought] I probably shouldn't be doing this. But I did it anyway. And here we are."

Gruppo was carrying a mobile phone when he entered the Capitol Building. *See* Figure 6, below. As Gruppo admitted during his debrief, once he saw the negative press coverage of the January 6 attack, he deleted all evidence from his phone, including photographs and videos he had taken inside the Capitol Building.



*Figure 5*

After entering the Senate Wing door, Gruppo briefly walked south before turning back around to talk to a group of U.S. Capitol Police ("USCP") Officers stationed near the door. According to Gruppo, he returned to ask the USCP Officers for directions on how to leave the building. But as depicted in Figure 7, below, despite the officer instructing Gruppo to leave

through the same door from which he had entered,[1] Gruppo ignored those instructions and instead continued walking south through the building.



*Figure 6*

Gruppo spent approximately six minutes inside the Capitol Building.  He walked through the Crypt and the Hall of Columns, and ultimately exited through the south door.

*The Charges and Plea Agreement*

Several weeks after Kelly was arrested, and at Kelly's urging, Gruppo's attorney contacted undersigned counsel to arrange for Gruppo's self-surrender.  By that point, several tipsters had already identified Gruppo as the unidentified male ("UM1") from the photographs contained in Kelly's complaint.  *See United States v. Kenneth Kelly*, 1:21-cr-00331 (CKK), ECF No. 1 (Apr.

---

[1]  In the surveillance footage, the USCP Officer can be seen pointing toward the Senate Wing door three times over the course of his conversation with Gruppo.

21, 2021).  At least one of the FBI tips also noted that Gruppo had tried to change his appearance by growing out his hair.

On May 24, 2021, Gruppo was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1), (a)(2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). ECF No. 1.  Gruppo self-surrendered on June 1, 2021 and was released on pretrial bond.  On June 7, 2021, Gruppo was charged by information with the same four offenses.  ECF No. 6. On August 18, 2021, he pleaded guilty to a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building.  ECF Nos. 19, 20.  By plea agreement, Gruppo agreed to pay $500.00 in restitution.

### III.    Statutory Penalties

The defendant is now scheduled to be sentenced on a single count of 40 U.S.C. § 5104(e)(2)(G).  As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000.00.  As discussed below, the defendant must also pay restitution under the terms of his plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply.  18 U.S.C. § 3559; U.S.S.G. § 1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a).  Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities

among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6).  In this case, all of the Section 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021, is a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants.  By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his individual conduct as we now discuss, this Court should note that each individual person who entered the Capitol on January 6th did so under the most extreme set of circumstances and played a role in the larger riot by encouraging others with his presence and by straining law enforcement resources.  *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers.  The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).  As a person who entered the Capitol, each rioter would—at a minimum—have crossed through numerous barriers and barricades and heard the din of the mob.  Depending on the timing and location of his approach, each rioter also may have observed extensive fighting with law enforcement and likely would have smelled chemical irritants in the air.

Make no mistake, no rioter was a mere tourist that day.  These rioters did not go through a security screening.  They did not receive an admission ticket or attend an introductory video about the history of our nation in the Capitol Visitors Center.  They were not given instructions by a docent or staff member on what to do as a tourist in the Capitol.  They did not move quietly through

public areas of the Capitol listening to their docent or staff member sharing insights about the building and its history and its importance to the American people.

While looking at the defendant's individual conduct, we must assess such conduct on a spectrum and with an eye towards its larger consequences.  This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or incited violence; (3) whether the defendant engaged in any acts of destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition.  While these factors are neither exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to his fair and just punishment.

The nature and circumstances of this offense are serious.  Gruppo traveled from New Mexico to D.C.—a lengthy and costly trip—to attend the "Stop the Steal" rally.  Once there, he joined the crowds of people who overwhelmed law enforcement and helped make the violent attacks and destruction possible.  He walked to the restricted grounds of the Capitol, where he was in a position to observe the chaos as other rioters attacked law enforcement and climbed scaffolding.  He joined in this chaos by scaling the retaining walls of the northern staircase and by entering the Capitol amidst law enforcement's efforts to establish a perimeter and clear rioters from the Upper West Terrace.  In surveillance videos, Gruppo is seen deliberately ignoring instructions from law enforcement officers.

During his debrief with law enforcement, Gruppo maintained that he entered the Capitol Building to escape the surrounding chaos. But that *post hoc* rationalization overlooks the many ways in which Gruppo deliberately contributed to that chaos. If Gruppo's intent in traveling to Washington D.C. was merely to attend the "Stop the Steal" rally, then there was no reason for him to walk to the U.S. Capitol grounds after former President Trump's speech. No one forced Gruppo on to the restricted Capitol grounds. Nor did anyone force Gruppo to climb the retaining wall and ascend the northern staircase. To the contrary, climbing the northern staircase would have required considerable physical effort, considering how packed the staircase was with other rioters at the time.

Gruppo further claimed during his debrief that he entered the Capitol Building because he felt unsafe while the officers on the Upper West Terrace worked to establish a perimeter. But his 28 years of military training, not to mention his common sense, should have taught him that the officers establishing a perimeter were not doing so to encourage more rioters to enter the U.S. Capitol Building. Gruppo should have known that the only appropriate response at that time would have been to leave the premises as soon as possible.

In sum, there were many offramps that Gruppo chose to ignore before entering the U.S. Capitol Building. There is no question that he knew his actions were wrong and unlawful. Indeed, any reasonable person would have recognized the red flags that day: the puffs of smoke rising above the northern staircase, the deafening sounds of rioters clashing with law enforcement, the sight of rioters scaling the outer walls of the Capitol Building, the presence of officers clearing a perimeter on the Upper West Terrace, and the shattered glass at the entrance to Senate Wing door. As a veteran and as a physician's assistant, Gruppo was especially attuned to the risks that his and

other rioters' conduct posed to law enforcement and to members of Congress. His ability to cast aside his decades of training and his better instincts renders his conduct that much more egregious.

Gruppo does deserve some recognition for ultimately coming forward and turning himself in. Unfortunately, however, his remorse came far later than it should have. Had Gruppo been truly remorseful for his actions, he would have turned himself in in the days following the January 6th attack. Instead, however, Gruppo deleted all evidence from his phone and began growing out his hair to change his appearance. Even when Kelly was arrested in April, Gruppo did not immediately come forward. Instead, it took Gruppo three weeks (and some convincing from Kelly) before he approached the government about self-surrendering. And it's not as if Gruppo didn't know he was wanted; indeed, by the time he turned himself in, numerous tipsters had already reported him to the FBI based on the images contained in Kelly's public complaint. As Judge Chutkan observed while sentencing a Capitol Riot misdemeanant to a term of incarceration, "[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. . . . It came when he realized that he could go to jail for what he did." *Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30. Thus, the defendant's prompt acceptance of responsibility, while mitigating, does not outweigh the lack of remorse he exhibited in the four-and-a-half months leading up to his self-surrender.

### B. The History and Characteristics of the Defendant

As set forth in the PSR, Gruppo has no criminal history and has been employed continuously since enlisting in the U.S. Army in November 1986. ECF No. 23 ¶¶ 24-30, 33-35, 49-53. Gruppo has also complied with his conditions of pre-trial release according to the compliance reports that have been filed in this case. Nevertheless, as a well-educated veteran who served close to thirty years in the Army, including as a Lieutenant Colonel, Gruppo should have

known better.  He should have recognized the threat that his conduct posed to the rule of law and the peaceful transfer of power—two democratic tenets that he repeatedly risked his life to defend during his multiple tours overseas.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol Building and grounds, and all that it involved, was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6th showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[2]  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most January 6th riot cases including in misdemeanor cases.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 8/4/2021 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation.  I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).  A sentence of probation or home confinement would be insufficient here.

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant.  18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

---

[2] Statement of Christopher Wray, Director, Federal Bureau of Investigation, Statement Before the Committee on Oversight and Reform U.S. House of Representatives at a Hearing Entitled "Examining the January 6 Attack on the U.S. Capitol" Presented June 15, 2021, *available at* https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf (last accessed Oct. 14, 2021).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  The violence at the Capitol on January 6th was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power.  As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed.  When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble.  The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification.  It is a damage that will persist in this country for decades.

Tr. 7/19/2021 at 69-70.

Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy.  It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation."  *Id.* at 70.

The gravity of these offenses demands deterrence.  This was not a protest.  *Id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The government acknowledges the defendant's assistance in this investigation and his prompt acceptance of responsibility after being charged in this case. The government further acknowledges that unlike other rioters, the defendant does not appear to have boasted about his conduct on social media.[3]

A relatively short term of incarceration is nevertheless appropriate in light of the defendant's belated remorse and his various efforts to obstruct the government's investigation. Specifically, the defendant obstructed the government's investigation by: (1) deleting all potential evidence from his phone within days of seeing the negative portrayal of the January 6 attack in the media; and (2) attempting to change his appearance. He also waited three weeks after Kelly was arrested before turning himself in, even though his image was all over the news by that point. Finally, in addition to demonstrating poor judgment, the defendant has demonstrated a willingness to violate his military oath to support and defend the Constitution, and, in so doing, to ignore the commands of law enforcement.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress. Each offender must be sentenced based on his individual circumstances, but with the backdrop of January 6th in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment.

---

[3] The defendant did admit to sending friends and family members photographs that he took outside the Capitol on January 6th. Due to the defendant's obstructive conduct, however, the government was not able to review these text messages and photographs when searching the defendant's phone.

The misdemeanor defendants will generally fall on the lesser end of that spectrum, but that in no way means that misdemeanor breaches of the Capitol on January 6, 2021 were minor crimes. A probationary sentence should not become the default.[4]  Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

While the number of sentenced defendants is low, we have already begun to see meaningful distinctions between offenders.  Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration.  And those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home confinement.

After a review of the applicable Section 3553(a) factors, the government believes that the defendant's conduct has earned him a custodial sentence.  The defendant's aggressive approach to the Capitol after observing the chaos for nearly two hours, his failure to obey various officers' command, his deletion of evidence from his phone, and his failure to turn himself in until three weeks after his companion had already been arrested, are aggravating factors that render

---

[4]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097 (PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165 (TSC).  The government is abiding by its prior agreement to recommend probation in these cases.  *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

Gruppo's conduct more egregious, particularly when committed by a long-serving veteran who certainly knew better at every stage.  His conduct warrants a sentence of incarceration

## V.      Restitution

As noted above, the defendant agreed under the terms of the plea agreement to pay $500 in restitution.   At the plea hearing, the Court ordered the government to address restitution in anticipation of the defendant's sentencing; specifically, how the amount of restitution complies with 18 U.S.C. §§ 3556, 3663, and 3663A.  ECF No. 22, at 21.  We submit this explanation to aid the Court.

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case.  Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).  Two general restitution statutes provide such authority.  First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096.  Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096.  The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664.  *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in § 3664).[5]

---

[5] Several other criminal statutes authorize restitution for specific offenses.  *See, e.g.*, 18 U.S.C. § 43(c) (damaging or interfering with an enterprise involving animals); 18 U.S.C. § 228(d) (child

The VWPA and MVRA share certain features.  Both require that restitution "be tied to the loss caused by the offense of conviction."  *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*).  Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[6]  *See* 18 U.S.C. § 3663(a)(2); 18 U.S.C. § 3663A(a)(2).  Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury.  *See Papagno*, 639 F.3d at 1096-97; § 3663(b); § 3663A(b).  Finally, under both statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim.  *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).  The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result.  *See Emor*, 850 F. Supp. 2d at 202.  The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[7]  *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1247 (10th Cir. 2009) (restitution order

---

support violations; 18 U.S.C. § 1593 (peonage, slavery, and trafficking in persons); 18 U.S.C. § 2248 (sex crimes); 18 U.S.C. § 2259 (sexual exploitation of children); 18 U.S.C. § 2264 (domestic violence); 18 U.S.C. § 2327 (telemarketing fraud); 18 U.S.C. § 853(q) (amphetamine and methamphetamine offenses).  None of those statutes are at issue in Gruppo's case.

[6] The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA.  *See United States v. Emor*, 850 F. Supp. 2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

[7] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review."  *Fair*, 699 F.3d at 513.

must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects.  As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49.  18 U.S.C. § 3663(a).  In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)).  By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[8]

While both statutes generally limit restitution to losses resulting from conduct that is the basis of the offense of conviction, they also authorize the court to impose restitution under the terms of a plea agreement. *See* 18 U.S.C. § 3663(a)(3); 18 U.S.C. § 3663A(a)(3); *see United States*

---

[8] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. § 3663(a)(1)(B)(ii); 18 U.S.C. § 3663A(c)(3)(B).

*v. Zerba*, 983 F.3d 983, 986 (8th Cir. 2020); *United States v. Giudice*, Case No. 13-cr-0495-01 (ES), 2020 WL 220089, at *5 (D.N.J. Jan. 15, 2020).  As relevant to Gruppo's case, the sentencing court under the VWPA "may also order restitution in any criminal case to the extent agreed to by the parties in a plea agreement."  18 U.S.C. § 3663(a)(3).  Under Section 3663(a)(3), a defendant may agree to pay restitution even where the offense of conviction falls outside of the statutes otherwise covered by the VWPA.  *See United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008) (upholding restitution agreement under Section 3663(a)(3) where defendant was convicted under 26 U.S.C. § 7201).  A defendant's agreement to pay restitution under Section 3663(a)(3) is a binding promise, *United States v. Pappas*, 409 F.3d 828, 830 (7th Cir. 2005), and the sentencing court is not required to independently evaluate the defendant's ability to pay when restitution is made part of the plea agreement under that provision, *United States v. Allen*, 201 F.3d 163, 167-68 (2d Cir. 2000).

Application of these restitution principles to Gruppo's case is straightforward.  The defendant entered a guilty plea to one count of Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).  That offense of conviction does not trigger the MVRA because it does not fall within the "subset" of crimes covered under that statute.  *See* 18 U.S.C. § 3663A(c)(1)(A); *Papagno*, 639 F.3d at 1096.  Gruppo's non-Title 18 offense of conviction also does not fall within the statutes covered by the VWPA.  *See* 18 U.S.C. § 3663(a)(1)(A). Restitution here nonetheless properly falls within the scope of Section 3663(a)(3) because the plea agreement requires Gruppo to pay $500 in restitution.  *See Anderson*, 545 F.3d at 1078-79.  The Court thus is authorized to impose restitution "to the extent agreed to by the parties" in the plea agreement.  18 U.S.C. § 3663(a)(3).

The VWPA also provides that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d). Because this case essentially involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A) (requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h).

The government and Gruppo, pursuant to the plea agreement, have requested the Court to apportion liability for restitution for damages arising from the riot at the United States Capitol. For this case, the parties have agreed that the Court may impose restitution in the amount of $500. This amount fairly reflects Gruppo's role in the offense and the damages resulting from his conduct. This amount properly reflects the defendant's role, but also considers the various legal and factual issues associated with calculating the actual losses for property damage to the United States Capitol and incurred by law enforcement agencies, additional costs incurred for security personnel, and bodily injuries sustained by law enforcement personnel. In consideration of these factors, the restitution amount reflected in the plea agreement fairly represents an apportionment of Gruppo's liability and, therefore, is proper in this case.

The Court has also asked the government in other cases to explain how it reached the restitution amount reflected in the plea agreement, which notes that, as of May 17, 2021, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages. ECF No. 23 ¶ 11. As noted above, determining the restitution amount is an "inexact science," *James*, 564 F.3d

at 1246, that must be based on a "reasonable approximation of losses supported by a sound methodology," *Gushlak*, 728 F.3d at 196.  The nearly $1.5 million figure quoted in the defendant's plea agreement represented loss estimates provided by Architect of the Capitol as of mid-May 2021.  The government continues to investigate losses that resulted from the breach of the Capitol on January 6, 2021, a process that involves several facets.  As a factual matter, the government is continuing to collect evidence concerning, *inter alia*, (1) the cost of damage to the Capitol Building and Grounds, both inside (*e.g.*, doors, windows, offices, office equipment, hallways, the Rotunda, the Crypt, etc.) and outside (*e.g.*, doors, windows, barricades, scaffolding, etc.); (2) the costs associated with the deployment of additional law enforcement units to the Capitol on January 6th; (3) the cost of broken or damaged law-enforcement equipment; (4) the cost of stolen property; and (5) the costs associated with bodily injuries sustained by law enforcement officers and other victims.  As a legal matter, *some* of these costs (such as property damage and medical injuries) clearly fall within the scope of the restitution statutes as applied to *some* defendants (*e.g.*, defendants who broke a window or committed aggravated assault against a law enforcement officer).  But other costs, including employees' work time, *see United States v. Wilfong*, 551 F.3d 1182, 1184 (10th Cir. 2008), and the proper method for assessing value of damaged or destroyed property, *see United States v. Shugart*, 176 F.3d 1373, 1375 (11th Cir. 1999), raise more challenging questions that should be resolved as they arise.  To the extent a victim's losses in a particular case are "not ascertainable" at the time of sentencing, Section 3664 permits an extension of up to 90 days for a "final determination" of those losses.  18 U.S.C. § 3664(d)(5); *see Dolan v. United States*, 560 U.S. 605, 611 (2010) (allowing a sentencing court to order restitution after the 90-day deadline under some circumstances).  None of these questions, however, arise in Gruppo's case.

## VI.    Conclusion

Sentencing here requires that the Court carefully balance the various factors set forth in 18 U.S.C. § 3553(a).  As detailed above, those factors on balance support a sentence of incarceration. The government recommends that this Court sentence Leonard Gruppo to thirty days' imprisonment and $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY


By: /s/ *Hava Arin Levenson Mirell*
HAVA ARIN LEVENSON MIRELL
Assistant United States Attorney
Detailee
CA Bar No. 311098
312 N. Spring St., Suite 1100
Los Angeles, CA 90012
Hava.Mirell@usdoj.gov
(213) 894-0717