```
                  UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA

   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
UNITED STATES OF AMERICA,        )  Criminal Action
                                 )  No. 21-391
vs.                              )
                                 )
LEONARD GRUPPO,                  )  October 29, 2021
                                 )  9:59 a.m.
            Defendant.           )  Washington, D.C.
                                 )
                                 )
   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF SENTENCING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT JUDGE**

<u>**APPEARANCES**</u>:

```
FOR THE GOVERNMENT: HAVA MIRELL
                    U.S. Attorney's Office
                    312 N. Spring St.
                    Los Angeles, CA 90012
                    (213) 894-0717
                    Email: hava.mirell@usdoj.gov


FOR THE DEFENDANT:  DANIEL R. LINDSEY
                    920 Mitchell Street
                    Clovis, NM 88101
                    (575) 763-8900
                    Email: danlindsey@suddenlink.net

                    CAMILLE WAGNER
                    1629 K Street
                    Washington, DC 20006
                    (202) 630-8812
                    Email: law@myattorneywagner.com

ALSO PRESENT,       ROBERT WALTERS, U.S. Probation

Court Reporter:     Elizabeth Saint-Loth, RPR, FCRR
                    Official Court Reporter

      Proceedings reported by machine shorthand, transcript
            produced by computer-aided transcription.
```

**P R O C E E D I N G S**

1            THE COURTROOM DEPUTY:  Matter before the Court,

2    Criminal Case No. 21-391, United States of America versus

3    Leonard Gruppo.

4            Counsel, probation officer, and pretrial agent,

5    please come forward and state your names for the record.

6            MS. MIRELL:  Good morning, Your Honor.

7    Hava Mirell on behalf of the United States.

8            THE COURT:  Yes.  Good morning, Ms. Mirell.

9            MR. LINDSEY:  Good morning.

10   Daniel Lindsey for Mr. Gruppo, pro hac vice, and Camille

11   Wagner.

12           MS. WAGNER:  Good morning, Your Honor.

13   Camille Wagner.

14           THE COURT:  Okay.  Good morning to all of you.

15           And good morning, Mr. Gruppo.

16           PROBATION OFFICER:  Good morning, Your Honor.

17   Robert Walters with probation.

18           THE COURT:  All right.

19           THE DEFENDANT:  Good morning, Your Honor.

20           THE COURT:  Good morning.

21           Okay.  You may all be seated.

22           All right.  So this sentencing hearing for Leonard

23   Gruppo is being held in person this morning; but the public

24   access line is being made available for persons to listen to

1    these proceedings remotely, rather than being present in the

2    courthouse.  I like to alert everybody in the courtroom that

3    there is a public access line that's open to the world, just

4    for your own information.

5              Anyone listening to the sentencing hearing over

6    the public teleconference line is reminded that, under my

7    Standing Order 20-20, recording and rebroadcasting of court

8    proceedings, including those held by videoconference, is

9    strictly prohibited.  Violation of these prohibitions may

10   result in sanctions, including removal of court-issued media

11   credentials, restricted or denial of entry to future

12   hearings, or any other sanctions deemed necessary by the

13   presiding judge.

14             All right.  So I am going to begin this sentencing

15   hearing the way I do all of my sentencing hearings, by

16   reviewing all of the documents that I have looked at and

17   materials that I have looked at, to make sure we're all

18   working off the same set of records and materials.

19             So, of course, I have received the presentence

20   investigation report, docketed at ECF 25; and the sentencing

21   recommendation, docketed at ECF 26, from the probation

22   department.

23             I have also received the following documents

24   submitted by counsel in advance of this hearing:  The

25   sentencing memorandum from the government, docketed at

1    ECF 25; as well as the sentencing memorandum submitted on

2    behalf of the defendant, Mr. Gruppo, docketed at ECF 28; an

3    exhibit describing Mr. Gruppo's military service; and a

4    letter from the defendant, docketed at ECFs 28-1, and 2.

5                Does the government have all of these records?

6                MS. MIRELL:  Yes, Your Honor.

7                THE COURT:  And does the defense?

8                MR. LINDSEY:  Yes, Judge.

9                THE COURT:  All right.  And am I missing anything?

10                MS. MIRELL:  No, Your Honor.

11                MR. LINDSEY:  No.  No, Your Honor.

12                THE COURT:  Okay.  Excellent.

13                All right.  Mr. Gruppo, just stand where you are,

14    please.

15                I just -- I like to tell defendants, in each of my

16    sentencing hearings, how the sentencing hearing will

17    proceed.  Some people have appeared in court a number of

18    times because they have prior records, and they realize that

19    judges do sentencings differently from courtroom to

20    courtroom.  Other defendants, like you, have never appeared

21    at a sentencing hearing before, so you don't know what's

22    really going to happen other than what your counsel has told

23    you.

24                So my sentencing hearings, and your hearing this

25    morning, will have three different steps to it.  At the

first step, I will determine whether the government and you,

with your counsel, have any objections to any of the factual

or other portions of the presentence investigation report

that's been filed in your case.  If there are objections, I

will resolve those.

The second step is where I hear from the lawyers

and then from you.  So if you want to know:  When is it

during this hearing that I have an opportunity to speak

directly to the judge, it's at the second step of the

hearing.  I will hear first from the government, then I will

hear from your counsel; and then I will give you the

opportunity to speak to me directly, so that's when that

will happen.

The last step requires the Court to explain the

reasons for the sentence imposed upon consideration of all

of the factors I am required to look at, under 18 U.S.C.

Section 3553(a), and then I will impose sentence.

By contrast to most sentencing hearings in front

of Article III judges, in this and every other court in the

country, I do not have to determine how the sentencing

guidelines apply in your case because it's a petty offense,

Class B misdemeanor, and so the sentencing guidelines don't

bother; and they don't apply to your case.  So whereas most

sentencing hearings have four steps where I have to go

through the guideline determination, that is not the case in

1    yours.

2            All right.  Do you have any questions about what

3    is going to be happening during the hearing this morning?

4            THE DEFENDANT:  No, Your Honor.

5            THE COURT:  Okay.  Thank you.  You may be seated.

6            THE DEFENDANT:  Thank you.

7            THE COURT:  All right.  Step one.  The final

8    presentence investigation report and sentencing

9    recommendation were filed in this matter on October 15th.

10           And I understand, from page 19 of the presentence

11   investigation report, that the government has no objection

12   to any of the factual or other determinations set out in the

13   PSR; is that correct?

14           MS. MIRELL:  That's correct, Your Honor.

15           THE COURT:  All right.  So then, Mr. Lindsey, have

16   you and your client read and discussed the presentence

17   investigation report?

18           MR. LINDSEY:  Yes, Judge.  We have.

19           THE COURT:  And do you have any objections to any

20   of the factual statements or other determinations set out in

21   the PSR?

22           MR. LINDSEY:  I do not.

23           THE COURT:  Thank you.  You may be seated.

24           Mr. Gruppo, could you just stand right where you

25   are.

1          Are you fully satisfied with your attorney in this

2     case?

3          THE DEFENDANT:  Yes, ma'am.

4          THE COURT:  And do you feel that you have had

5     enough time to talk to Mr. Lindsey about the probation

6     department's presentence investigation report, the

7     sentencing recommendation in this case, and all of the other

8     papers submitted in connection with your case?

9          THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  Okay.  Thank you.  You may be seated.

11          Hearing no objection from either side, the Court

12     will accept the factual portions of the presentence

13     investigation report as undisputed and as my findings of

14     fact at sentencing.

15          We're now at step three.  I will hear from the

16     government first about application of the factors under

17     3553(a).

18          MS. MIRELL:  Yes.  Good morning, Your Honor.

19          I want to begin by saying that I listened to the

20     Court's sentencing yesterday, and I understand this Court's

21     position.

22          So to aid the Court in understanding the

23     government's position in this case, I want to focus on the

24     factors that led us to recommend a 30-day term of

25     imprisonment for Mr. Gruppo.

1          In so doing, I also intend to address some of the

2     concerns that the Court expressed yesterday over the

3     government's charging and plea bargaining decisions in these

4     Capitol riot cases.

5          There are three factors --

6          THE COURT:  That's all I am looking for, an

7     explanation.

8          MS. MIRELL:  There are three factors that

9     distinguish Mr. Gruppo from other rioters facing misdemeanor

10    charges in these cases.  First is Mr. Gruppo's outright

11    disregard of law enforcement's instructions during the riot

12    on January 6th as evidenced most prominently by his failure

13    to exit the Senate wing door, after being instructed no less

14    than three times by U.S. Capitol police officers.

15         His disregard for law enforcement is rendered more

16    egregious by the second distinguishing factor, which is his

17    prior military service.

18         As this Court recognized during yesterday's

19    hearing, it is, quote, inconceivable that someone of

20    Mr. Gruppo's background who swore an oath to support and

21    defend the Constitution could participate in a riot that

22    would cause such damage to our global reputation as a

23    democracy.  The last factor is that Mr. Gruppo destroyed

24    evidence of his participation in the riot.

25         Of the misdemeanor defendants who engaged in

1    evidence destruction, five have received recommendations for

2    custodial sentences; and one received a recommendation of

3    home confinement, but was nevertheless sentenced to 45 days'

4    incarceration.  None have received a probation-only

5    sentence.

6                THE COURT:  All right.  So let me just -- let me

7    just back up because I want to go into detail about the

8    reasons that the government has made its recommendation for

9    a period of incarceration --

10               MS. MIRELL:  Yes, Your Honor.

11               THE COURT:  -- for Mr. Gruppo; and I appreciate

12   how the government is using his prior military service.

13               And I do -- I do think that it's somewhat

14   ironic -- I don't know how else to put it -- I think

15   Mr. Lindsey put in his papers that it's something --

16   commenting about how his military service is being used

17   against him when, in fact, someone who served in the

18   military for 28 years -- served in four combat zones -- as a

19   physician's assistant saving lives in, really, under the

20   most dire circumstances, that I am not sure most of the

21   people sitting at the government's table would ever be able

22   to survive, quite frankly; and that having done that

23   service -- that instead of expressions of respect for that

24   service, the government is holding it against him.  I am a

25   little bit puzzled that that is, like, the government's

1    second factor for why you are thinking he deserves jail

2    time.

3             MS. MIRELL:  Well, Your Honor, I do not -- and the

4    government does not intend to express --

5             THE COURT:  And it's not just because I grew up on

6    military bases around the world and count, among close

7    friends, my own parent's service in the army who -- my

8    father also parachuted, and so on.  I mean, I just don't --

9    it surprises me that the government is holding that service

10   that, I think, most Americans would have enormous respect

11   for, against this man.

12            MS. MIRELL:  I want to state in no uncertain terms

13   that I do have tremendous respect -- and the government has

14   tremendous respect for all of those who save and who risk

15   their lives for our country, and especially Mr. Gruppo who

16   goes out into combat zones and provides much needed medical

17   services to injured soldiers; that's commendable.  And he

18   should deserve recognition for that.

19            THE COURT:  Beyond -- beyond "commendable"; it's

20   pretty heroic, and that's why he has so many honors.

21            MS. MIRELL:  Agreed, Your Honor.

22            The purpose of bringing this up as a factor --

23            THE COURT:  Let -- can I -- let me just go back to

24   how I am looking at the facts --

25            MS. MIRELL:  Sure.

1          THE COURT:  -- and just -- because, as I looked at

2     the government's recommendation for 30 days' incarceration

3     in this case, these are some of the factors I look at,

4     because -- at the same time that the government is citing

5     some factors for a 30-day period of incarceration, the

6     government, as I understand it -- and this is what I want to

7     check; that the government is acknowledging that Mr. Gruppo

8     was in the Capitol Building for about seven minutes or less,

9     is that right?

10          MS. MIRELL:  Yes, Your Honor.

11          THE COURT:  And he didn't physically attack any

12     police officer or other person, correct?

13          MS. MIRELL:  That is correct.

14          THE COURT:  And he didn't personally damage any

15     property inside the Capitol, correct?

16          MS. MIRELL:  That is correct.

17          THE COURT:  And he didn't engage in any chanting

18     or any other verbal statement or even carrying signs to

19     incite others to follow him into the Capitol; is that

20     correct?

21          MS. MIRELL:  With respect to the signs, we didn't

22     see any evidence of signs.  But we don't have audio footage,

23     so I can't make a representation as to whether he was

24     shouting.

25          THE COURT:  Okay.  But the video that you have

1    seen -- you haven't seen any evidence of that?  I haven't.

2             MS. MIRELL:  That's correct.  Of the evidence we

3    have, correct.

4             THE COURT:  He voluntarily turned himself in to

5    the FBI?

6             MS. MIRELL:  Yes, eventually.

7             THE COURT:  Okay.  And he fully cooperated at the

8    outset, when he turned himself in to the FBI, by turning

9    over to law enforcement all of his devices, his passwords to

10   devices, and all of his social media accounts; is that

11   right?

12            MS. MIRELL:  That's correct.

13            THE COURT:  And he had no inflammatory language on

14   social media before, during, or after January 6th, let alone

15   any calls for political violence?

16            MS. MIRELL:  We were not able to identify any

17   social media associated with Mr. Gruppo, and we did not

18   identify any evidence of such.

19            THE COURT:  Okay.  And he promptly agreed to enter

20   a plea agreement after an offer was extended by the

21   government and accept responsibility?

22            MS. MIRELL:  That's correct, Your Honor.

23            THE COURT:  And you don't have any evidence of any

24   preplanning by him or carrying any weapon into the Capitol

25   Building, or even wearing any defensive gear as if he were

1    anticipating to be engaged in any kind of violent

2    confrontation that day; is that correct?

3              MS. MIRELL:  That's correct.

4              THE COURT:  Okay.  So I look at all of those basic

5    facts.

6              And absent what the government views as -- absent

7    his military service, if he weren't somebody who served in

8    the military, in four combat zones for 28 years saving

9    lives, would that make a difference to the government?

10             Would that make a difference to the government in

11   terms of its recommendation of 30 days' incarceration here?

12             MS. MIRELL:  I think it would, Your Honor.

13             THE COURT:  And the government would then -- if he

14   had not done that service, the government would not be

15   recommending 30 days' incarceration here?

16             MS. MIRELL:  If he wasn't trained to recognize the

17   danger that was evident on January 6th; if he wasn't trained

18   to assist, rather than to harm; if he wasn't -- he hadn't

19   been trained for 28 years to actually care for law

20   enforcement and recognize exactly the circumstances that his

21   and many others conduct caused, that would affect the

22   government's decision.  But the fact that he did receive

23   that training, and the fact that he overlooked -- and

24   intentionally overlooked his oath, to commit one of the most

25   destructive acts against our Constitution and our democracy,

1    that does affect the government's view of his conduct.

2           THE COURT:  All right.  Well, I will just be

3    honest; I don't view his military service that way.  I just

4    can't bring myself to do that.

5           I think people's -- we look at people's criminal

6    history as an indication of whether or not they need

7    specific deterrence, which is an important factor in

8    sentencing, and this is a man who has no prior criminal

9    history; to the contrary, he has a heroic professional

10   career behind him.  So I don't view his prior military

11   service the way -- the same way the government does in this

12   case; so that's number one.

13           So let's look at the other reasons.

14           I think you -- the other circumstances -- putting

15   off the table, just a disagreement between the Court and the

16   government and how heroic military service is viewed in

17   connection with sentencing, the other reasons -- as I

18   understand it, from the government's papers and oral

19   presentation here -- is that there were three other

20   circumstances that prompted the government to make a

21   recommendation of 30 days' incarceration:  Not leaving the

22   door he entered the Capitol by, after being told to do so by

23   a police officer; two, a purported delay in turning himself

24   into law enforcement after his friend, Kenneth Kelly, had

25   been arrested; and three, what the government calls his

1    obstructive conduct -- and you used the word "obstruction,"

2    and, let me tell you, judges pay attention to that --

3    obstructive conduct of deleting January 6th related photos

4    and videos from his phone; and I think there was also

5    something about growing his hair after January 6th.

6            So absent those three reasons:  Not leaving by the

7    door he entered the Capitol, after being told to do so by

8    the police officer; a purported delay in turning himself

9    into to law enforcement after Kenneth Kelly, his friend, who

10   he was with that day had been arrested; and three, alleged

11   obstructive conduct -- absent those three circumstances,

12   would the government be recommending probation in this case

13   with no prison term or, because of the military service, you

14   still would?

15           MS. MIRELL:  Well, Your Honor, I think there's two

16   additional factors that I would note.

17           THE COURT:  Okay.

18           MS. MIRELL:  First is scaling the walls of the

19   Capitol.

20           THE COURT:  Scaling the walls.

21           MS. MIRELL:  Scaling the walls.

22           The defendant acknowledges in his memorandum that

23   he did have to actually climb up a bannister that was his

24   height in order to get onto the Capitol, and what that

25   evinces about his intent and what he knew about how wrongful

1    his conduct was; that's a factor that weighed on the

2    government.

3            I think what the defendant witnessed at the upper

4    West Terrace, with police officers establishing a perimeter

5    and very visibly trying to push rioters away from the area,

6    and his decision at that moment to then enter the Capitol as

7    he saw officers trying to push people away; that weighed on

8    the government's decision as well.

9            I believe the government would not offer any

10   probation-only recommendation for this defendant based on

11   the factors -- even taking away the military service --

12   based on the factors we see today, we would consider,

13   obviously, home confinement with probation, as we have in

14   several other cases; but probation only, I don't think we

15   would be extending that.

16           I know Your Honor expressed some concerns

17   yesterday about the probation-only recommendation in the

18   government's early cases in, namely, the Morgan-Lloyd case,

19   the Bissey case, and the Ehrke case.

20           First, we think those cases are distinguishable

21   based on the factors I have already outlined, some of which

22   the Court might agree with, some of which the Court may not;

23   but they did not involve deliberate decisions to ignore law

24   enforcement authorities; they did not involve destruction of

25   evidence; and background and characteristics were different,

1        although we respect the Court's different opinion there.

2                But we also want to help the Court understand what

3        an anomaly those cases were, and what those recommendations

4        were; and I want to provide a few statistics.

5                The government has extended 268 pleas in these

6        Capitol riot cases.  Of those 268 pleas, 5 included

7        probation-only recommendations; that is less than 2 percent

8        of cases.  And so suffice it to say that the probation-only

9        recommendation is the exception and not the norm and should

10       not, as this Court and many other courts in this district

11       have recognized, become the default in most of these cases.

12               Had Anna Morgan-Lloyd come to the government and

13       asked for a plea from the government today, taking into

14       account her post-plea conduct, we would not offer her a

15       probation-only recommendation.

16               As the Court is aware, the government's

17       investigation is constantly evolving.  And we continue to

18       analyze factors based on our current understanding of what

19       happened on January 6th; and we have come to appreciate that

20       a probation-only recommendation likely will not be

21       appropriate in most of these cases.

22               THE COURT:  All right.  Well, let's go into the

23       factors that you have noted here.  Not leaving by the door

24       he entered the Capitol after being told to do so by a police

25       officer, I mean, I guess -- and the CCTV footage shows that

1  he did speak to police officers.  That's -- I don't think

2  the government disputes that corroborates his explanation

3  that he was actually -- once he got inside the building, was

4  asking police officers how to get out?

5          MS. MIRELL:  Correct.

6          THE COURT:  Right.  So, I mean, his explanation,

7  for what it's worth, is that he didn't want to go out the

8  same door because it was crowded with the mob trying to get

9  in, so he walked the path of least resistance to get out; it

10  took him about seven minutes to do that, and he was in and

11  out.

12          So is that -- I mean, is it because he followed

13  the police officer's direction to leave the building but he

14  didn't take the same door that he came in?

15          To me, it's like the police officers told him to

16  get out; he was looking for a way out.  He left.  He didn't

17  take the nearest door.  His excuse is there were tons of

18  people coming in.  Based on what I have seen on videotapes,

19  there was a huge mass of people, thousands of people trying

20  to get in.  Perhaps -- does the government think he could

21  have gotten out easily that way?

22          MS. MIRELL:  Well, I think -- yes.  I think, Your

23  Honor, the evidence actually tends to belie Mr. Gruppo's

24  explanation for why he didn't --

25          THE COURT:  It tends to belie?

1          MS. MIRELL:  My apologies.

2          It actually tends to undermine or casts doubt on

3     Mr. Gruppo's explanation because the full video footage --

4     first of all, Mr. Gruppo entered about 45 minutes after the

5     breach of that Senate wing door, which is when we saw the

6     large masses of people come in.  There was tons of traffic.

7     And perhaps, at that time, it would have been very difficult

8     for a rioter to leave the door (sic).

9          But by the time that Mr. Gruppo had entered, it

10    had become more of a trickle through the door.  And we know

11    that because other rioters left through that door at around

12    the same time that Mr. Gruppo entered; so it wasn't

13    impossible to leave.

14         I anticipate that Mr. Gruppo is going to say he

15    felt unsafe because a perimeter was being established and he

16    saw clashes between law enforcement officers and rioters,

17    and he just wanted to avoid that perimeter.

18         Law enforcement officers were pushing the rioters

19    north.  There is another way to exit the Capitol grounds

20    aside from entering the building -- and that would have been

21    to walk in the direction that law enforcement officers were

22    encouraging rioters to walk.

23         I understand that Mr. Gruppo did not understand or

24    comprehend law enforcement's thinking and why it was trying

25    to establish a perimeter and where, but that shouldn't have

1    prevented him from obeying their orders.

2         So I would also note, with respect to the amount

3    of time and his entry and whether he was able to leave or

4    not -- you know, they're comparing him -- putting him on the

5    spectrum of other rioters; there were people who walked in

6    and out, and that's it.  Once they heard from law

7    enforcement go back out that door, they did; but Mr. Gruppo

8    didn't do that.

9         You know, I recognize he did walk directly

10   through; didn't engage with officers along the way as far as

11   we know, but there was an opportunity for him to leave.

12        THE COURT:  All right.  Let's go to the next one,

13   which is a delay in surrender.

14        The defense counsel has said that any delay in

15   this matter was solely due to Mr. Gruppo's counsel's busy

16   schedule and not any fault of Mr. Gruppo.

17        I mean, Mr. Lindsey is a busy lawyer.  We got all

18   of the details of his very busy schedule in his briefing

19   laying out exactly what he was doing every single day, in

20   trying to figure out who was the right person to call within

21   the U.S. Attorney's Office within days of Mr. Gruppo

22   figuring out that Kenneth Kelly had been arrested.  He tried

23   to find counsel; he found a counsel.  He had never been

24   involved in the criminal justice system before; it wasn't

25   like he had a criminal lawyer on retainer, he had to find

1    one.  He found one; told the lawyer:  I want to turn myself

2    in.  And then it took his lawyer a little bit of time to

3    figure out who to call; find time to do that.

4           Does the government have any reason to dispute the

5    outline of this delay in turning himself in?

6           MS. MIRELL:  Your Honor, we do not dispute that

7    outline.

8           THE COURT:  And so I -- is that a reason, this

9    purported delay -- and let me just also confirm.  At the

10   time that Kenneth Kelly was arrested and Mr. Gruppo then

11   started to find a lawyer to figure out how to turn himself

12   in, was there a criminal complaint outstanding at that time

13   for Mr. Gruppo?

14          MS. MIRELL:  There was not a criminal complaint.

15          THE COURT:  So it's not like he was a fugitive

16   from an arrest warrant?

17          MS. MIRELL:  No.  No, Your Honor.

18          You will notice, in my presentation this morning,

19   that I actually didn't touch upon the delay and

20   self-surrender.

21          THE COURT:  Okay.  Perfect.  Then no more --

22   because you have now backed off of that particular reason

23   set forth in your papers for why there was a 30-day

24   incarceration period recommendation.

25          Okay.  Now let's get to the obstruction reason.

1          MS. MIRELL:  Sure.

2          THE COURT:  And I guess, as I understand the

3     obstruction reason, the government claims the defendant -- a

4     very serious allegation -- the defendant obstructed the

5     government's investigation by deleting all potential

6     evidence from his phone within days of seeing the negative

7     portrayal of the January 6th attack in the media; that's

8     from the government's memorandum at page 17.

9          And, in fact, the defendant says that he deleted

10    the photographs after he got back to his home in New Mexico

11    because he saw what had happened in the days following

12    January 6th.  So this is certainly before Kenneth Kelly had

13    been arrested, right?

14         MS. MIRELL:  Yes, Your Honor.

15         THE COURT:  And it was certainly before Mr. Gruppo

16    was aware that law enforcement might be looking for him; is

17    that right?

18         MS. MIRELL:  I don't believe so.

19         Your Honor, I think that it's fair to say that

20    most Capitol rioters were on notice in the hours -- in the

21    days after January 6th that law enforcement was looking for

22    them and that they were being investigated, and that we were

23    prosecuting these cases.

24         THE COURT:  So Mr. Gruppo says that he deleted the

25    photos -- photos from the phone, if I recall correctly,

1    because he was ashamed and embarrassed at what he had done,

2    and he -- which is a far cry from wanting to hide evidence

3    that could be used against him in a criminal prosecution;

4    that's what you need for obstruction.

5           So what is the government's evidence that the

6    deletion of the material from his phone was warranted,

7    calling it obstructive behavior, because he evidenced some

8    intent to hide evidence that could be used against him?

9           MS. MIRELL:  Based on just the defendant's

10   awareness that, in the days after January 6th, law

11   enforcement was investigating this Capitol riot case.

12          Now, of course, the defendant is not charged with

13   obstruction, and the government did not have evidence

14   sufficient to prove obstruction prior to Mr. Gruppo's

15   proffer with the government; but he admitted to seeing the

16   coverage of January 6th, to knowing that there was interest

17   in prosecuting these cases, and then -- to then deleting

18   this.

19          Now, of course, he can delete for both reasons;

20   one, he does feel ashamed; but he might also feel ashamed

21   because law enforcement is investigating this, and coming

22   home and realizing that the majority of America actually

23   frowned upon and was horrified by the conduct is not -- is

24   not mutually exclusive from recognizing that I am at risk of

25   prosecution here.

1          And, you know, in addition, we did have tipsters,

2    uncorroborated -- but tipsters who have said:  Word of mouth

3    is that he has changed his appearance; so that's also

4    another factor.  But, again, that's not beyond a reasonable

5    doubt, and that's why we haven't charged obstruction here.

6          THE COURT:  Well, the government did get his

7    phone; so the government could have done a forensic review

8    of that phone and could have pulled off anything it wanted,

9    right?

10         MS. MIRELL:  Yes, Your Honor.

11         My understanding, based on the conversations with

12   the agent, was the technological capacities of the

13   investigating agency in Texas did not have the technology to

14   be able to establish whether items had been affirmatively

15   deleted, or where -- sometimes the government can receive

16   reports in which the reports indicate certain media have

17   been deleted and recover that --

18         THE COURT:  A Cellebrite report.

19         MS. MIRELL:  Exactly.

20         -- and, you know, we can see the recovered media;

21   we didn't have that here, so we couldn't establish it.

22         THE COURT:  They did not have access to Cellebrite

23   software to generate a Cellebrite extraction?

24         MS. MIRELL:  The technological --

25         THE COURT:  I thought every law enforcement agency

1    in the country has that.

2                MS. MIRELL:  Well, Your Honor, I think had --

3                THE COURT:  The FBI in Texas doesn't?

4                MS. MIRELL:  Had this case proceeded to trial, I

5    think they would have sent it off for further forensic

6    review, but by the time --

7                THE COURT:  New Mexico.  Sorry.  Sorry.

8                MS. MIRELL:  Well, it was investigated in Texas;

9    so you are correct, Your Honor.

10               We would have sent it off for further review, you

11   know, had we wanted to try to prove obstruction.  But here

12   they saw nothing from January 6, and the defendant entered a

13   guilty plea.

14               THE COURT:  Well, he deleted all this media so he

15   didn't post pictures on social media to drum up support for

16   some conspiracy theory about the 2020 presidential election

17   or to incite political violence anywhere else, right?

18               MS. MIRELL:  Correct.  We don't have evidence of

19   that.

20               THE COURT:  All right.  So your other reasons,

21   that he climbed -- scaled the walls of the Capitol.  I had

22   understood that he got on a ledge and went up a ledge -- you

23   know, a ledge on the side of the Capitol steps that's a very

24   wide ledge.  I wouldn't do that; but I guess he did that.

25               And you call that "scaling"?  Is that what you are

1    calling "scaling"?

2              MS. MIRELL:  Of course, Your Honor, there is a

3    spectrum, as there always is in these cases.  Some people

4    were scaling 20-, 30-feet walls, but the defendant --

5              THE COURT:  And climbing scaffolding.

6              MS. MIRELL:  Correct.

7              Again, there is a spectrum.  But he had to exert

8    some energy to get up a wall that was his height; that's not

9    easy to do for a physically fit -- for anyone --

10             THE COURT:  So that's why he was probably the only

11   person being able to do that, and it was a clear path to the

12   Capitol; wouldn't you say?

13             MS. MIRELL:  He wasn't the only person doing that.

14   But that -- when you're at the juncture where you're

15   deciding:  Hey, am I going to pull myself up on a bannister,

16   on the Capitol, to get into a -- it was packed like

17   sardines, this staircase, as Your Honor has seen in the

18   footage.  And to join that fray and to position myself up on

19   the upper West Terrace and confront -- and seeing this

20   confrontation between law enforcement officers -- that was a

21   red flag; and he deliberately overlooked that red flag.

22             THE COURT:  Right.  Well, I am just looking

23   through a number of the other cases, some of which you have

24   mentioned.  You know, I am just looking because there are so

25   many of these.  Judges are not going to be able to do this,

1    like -- you know, compare this guy, this guy, this guy.

2             You know, but -- you know, some of the things that

3    we have -- some of these other defendants for whom the

4    government recommended a probationary period, some with

5    detention, some without; but, generally, no incarcerative

6    period, certainly not an incarcerative period of 30 days --

7    you know, where people who, like, went through broken

8    windows, stayed inside for, like, 24 minutes, holding signs:

9    The storm is here.  After January 6th -- writing proudly

10   about it.  CCTV footage showing chanting and yelling near an

11   officer -- that's Daniel Doyle, and the government

12   recommended probation with some home confinement.

13            I just think that there are other people who saw

14   what was going on, actually were chanting and encouraging

15   what was going on, for whom the government recommended

16   probationary periods; some not just probation only, but some

17   with home detention.  And from what I have seen of

18   Mr. Gruppo's offense conduct, he didn't do any of that

19   cheering on.

20            I mean, all of them saw the behavior.  And I don't

21   think the government is recommending 30 days' incarceration

22   for everybody who was there who saw what was going on.

23            MS. MIRELL:  No, Your Honor, we are not.  But I --

24            THE COURT:  So -- all right.  Is there anything

25   else you want to add?

1           MS. MIRELL:  Nothing further, unless the Court has

2      any further questions.

3           THE COURT:  No.  Mr. Lindsey.

4           MR. LINDSEY:  May it please the Court.

5           Chief Judge Howell, I live in a small military

6      community in eastern New Mexico.

7           THE COURT:  I'm sorry.  I can't hear you,

8      Mr. Lindsey.

9           MR. LINDSEY:  I live in a small military town in

10     eastern new Mexico; and I got there because my dad served in

11     the military.  And he had a lot in common with Mr. Gruppo;

12     he got his jump wings at Fort Benning, Georgia, like my

13     brother did in the 82nd Airborne, and we ended up in this

14     military town.

15          And when Mr. Gruppo came to talk to me about this,

16     he wanted to turn himself in immediately.  He was

17     humiliated, devastated.  He was UM1 in those photographs;

18     and he wanted me to make arrangements to turn him in

19     immediately.  We did everything we could.  I bear

20     responsibility for any delay there.

21          I did not know at the time the extent of

22     Mr. Gruppo's military career; and we tried to keep it quiet.

23     And he wanted to keep it quiet because he felt like he

24     dishonored that military service for 27 years; and we tried

25     to do that.

1          THE COURT:  And he did.  You know, let's not mince
2    words.
3          MR. LINDSEY:  And I asked him -- he gave me his
4    story.  Everything he told me was the truth.  This man is
5    honorable.  It has been an honor for me to represent him;
6    for him to cooperate with law enforcement and the Select
7    Committee investigating this of Congress, to give up those
8    crucial Fifth Amendment rights and give statements and
9    cooperate as much as he can.
10          The bottom line here is that Mr. Gruppo made a
11    mistake.  And anyone who has been in this business for over
12    30 years as I have, sees that good people make mistakes.
13    Mr. Gruppo made a serious mistake; he knows it; he has taken
14    full responsibility for it.  He has cooperated in any way,
15    shape, or form that he can.  He turned over his devices.
16          We're well aware that the Court is an expert in
17    forensics, digital forensics; and we gave them the
18    passwords.  Our little sheriff's office has a Cellebrite
19    program that they can pull off everything on someone's
20    phone, pictures, everything -- except Snapchats; but they
21    get those from California through a subpoena.  So the
22    government has had his devices.  They had a 5-terabyte hard
23    drive; his iMac Pro, his phone -- everything.
24          This man did not destroy any evidence in this
25    case.  He has been honest; he has been truthful; and he is

1    very remorseful.  He has -- there will be an asterisk, as he

2    told me, on his military career.  Everything that he did,

3    all the good things that he did -- there is going to be an

4    asterisk there because he followed the recommendations of a

5    President who was amoral and cannot tell the truth -- a

6    former President; and he's paying the price for it.  And he

7    is here in this courtroom to accept any punishment that you

8    have for him.

9            I understand the Griffith case yesterday; I spoke

10   to counsel regarding that, and regarding that -- the split

11   type of sentence that she had in that case; she gave us some

12   good advice.  But in this case -- Judge, we think a

13   probationary period is appropriate in this case, whatever

14   the amount is that you choose.

15           I am pretty saddened that the government would try

16   to use his government service against him; but I understand

17   what they're saying because they take an oath to defend this

18   country from all enemies, foreign and domestic.  And this

19   was a riot.

20           He doesn't -- when he got back to his hotel and

21   started seeing the news reports, he was devastated and

22   sickened.  So he will accept any punishment that you have,

23   Judge; and if it's probation, we appreciate probation.  He

24   will comply with every single thing that you ask him to do.

25   He is an honorable man, and it has been a pleasure for me to

1     work with him.  Thank you.

2               THE COURT:  Thank you, Mr. Lindsey.

3               Mr. Gruppo, this is now your opportunity to speak

4     to me.

5               THE DEFENDANT:  Thank you, Your Honor.

6               THE COURT:  Mr. Gruppo, let me just begin.

7               Take a breath -- because you do medical work; you

8     don't necessarily stand up in a public courtroom and speak;

9     and I know it can be hard on some people to do that.  But I

10    have to say you write well.  I thought your letter to the

11    Court was very eloquently put, and moving.

12              And, in fact, if you wanted to read portions of

13    your letter to the Court -- if that would be easier for you,

14    because I can tell this is a very emotional time for you, I

15    invite you to do that.

16              THE DEFENDANT:  Thank you, Your Honor.  I think I

17    can summarize the gist of the letter that I was trying to

18    convey to you.

19              I am ashamed.  I am very sorrowful -- I have been.

20              As soon as I got back to my hotel, I couldn't

21    believe the reports I saw.  I shouldn't have been there.  I

22    shouldn't even have went to the Capitol; it was a huge

23    mistake.

24              I have let down so many people because of this.

25    Everybody -- the Capitol Police, my congressional leaders,

1       the President -- both Presidents, my family, my friends, my

2       employers.  It's been -- I don't know what to say except I'm

3       sorry.

4               I shouldn't have done it.  I take full

5       responsibility.  Whatever you decide, I accept without

6       complaint, Your Honor.  That's all I have.

7               THE COURT:  All right.  Well, I will explain the

8       sentence I am about to impose, and then impose sentence.

9               Mr. Lindsey, you can stand with your client.

10              So after considering the sentencing memoranda that

11      have been submitted by both the government and by

12      Mr. Gruppo's counsel, reviewing the probation office's

13      presentence investigation report and the sentencing

14      recommendation, hearing argument here today, I must now

15      consider the relevant factors, under 18 U.S.C. Section

16      3553(a), and ensure that I impose a sentence that is

17      sufficient, but not greater than necessary to comply with

18      the purposes of sentencing.

19              And let me just review what those purposes of

20      sentencing are.  They're set out in the statute; and those

21      purposes include:  The need for the sentence imposed to

22      reflect the seriousness of the offense; to promote respect

23      for the law; provide just punishment for the offense; deter

24      criminal conduct generally and, also, specific deterrence to

25      protect the public from further crimes or in future crimes

1    by this defendant, Mr. Gruppo, and promote rehabilitation.

2              So, in connection with fashioning a sentence that

3    addresses all of those purposes, I must, under 18 U.S.C.

4    Section 3553(a), consider the nature and circumstances of

5    the offense; the history and characteristics of the

6    defendant, Mr. Gruppo; the types of sentences that are

7    available; the need to avoid unwarranted sentencing

8    disparities among defendants with similar records found

9    guilty of similar conduct; and the need to provide

10   restitution to any victims of the offense.

11             And I am going to begin with the restitution

12   amount owed by Mr. Gruppo given that the statute of

13   conviction is not covered by the two general restitution

14   statutes codified at 18 U.S.C. Sections 3663 and 3663(a);

15   the Court has no authority to determine any restitution

16   amount, and is limited by what the government has agreed to

17   in the plea agreement.  And the plea agreement provides for

18   a restitution judgment of $500 which is the amount the Court

19   will order, pursuant to 18 U.S.C. Section 3663(a)(3).

20             So regarding the nature and circumstances of the

21   offense, Mr. Gruppo has been convicted of parading,

22   demonstrating, or picketing in a Capitol Building, in

23   violation of 40 U.S.C. Section 5104(e)(2)(G), which is a

24   petty offense, Class B misdemeanor.

25             I am not going to go into detail describing the

1  nature and circumstances of the offense conduct on

2  January 6th, 2021, other than to say what I have said

3  before; that the rioters attacking the U.S. Capitol on

4  January 6th, as part of a large mob, were not mere

5  trespassers engaging in protected First Amendment protests;

6  they were certainly not tourists.  And I say that again and

7  again because there still seems, in some areas, to be a

8  debate about that issue.

9           As countless videos show, the mob that attacked

10  the Capitol was violent, and everyone participating in that

11  mob contributed to that violence by their sheer numbers and

12  their intentional focus on getting inside the Capitol

13  Building; some using force, chemical sprays, many types of

14  objects to push past police lines, through smashed doors and

15  windows, with alarms blaring, tear gas flowing from both

16  sides -- the police towards the rioters, the rioters towards

17  the police.

18           The mob that the defendant was part of in the

19  attack on the Capitol, on January 6th, forced Congress and

20  the Vice President to evacuate, staffers to hide behind

21  locked doors and desks, delayed certification of our

22  presidential election while the world was watching; caused

23  significant damage domestically to our faith that:  No

24  matter what our political parties or views are, as

25  Americans, we believe in the peaceful transition of power

1    after an election.

2         Mr. Gruppo, you did help facilitate that riot just

3    by being there, adding to the numbers that overwhelmed law

4    enforcement and disrupting the proceedings of Congress.

5         And the government is absolutely right when it

6    says that you had many off ramps that you chose to ignore

7    before entering the U.S. Capitol Building.  You saw puffs of

8    smoke rising from the northern staircase; deafening sounds

9    of rioters clashing with law enforcement; rioters scaling

10   the outer walls of the Capitol Building; the presence of

11   officers trying to clear a perimeter on the upper West

12   Terrace; shattered glass at the entrance to the Senate wing

13   door.  But you did plow on to get into that building by

14   climbing on this stairwell ledge -- climbing up.

15        You stayed inside around seven minutes, spending

16   some of that time talking to police officers asking about

17   the best exit.  You didn't follow the police direction to

18   exit through a door where the mob had been coming in.

19        The government contends that, at that point, it

20   was just a trickle, you should have been able to find your

21   way out.  I am going to give you, in some ways, the benefit

22   of the doubt on that.  I saw pictures of that mob; it looked

23   like a zoo, densely packed.  A person trying to find a quick

24   and easy safe way out would likely have found another way

25   out than that door; I understand that.

1           You admit you should have known better, but

2     somehow that day you didn't.  And you say that you headed to

3     the Capitol Building not with any intent to obstruct and

4     impede congressional proceedings; but because the

5     then-President, Trump, told protesters at the "stop the

6     steal" rally -- and I quote:  After this, we're going to

7     walk down; and I will be there with you.  We're going to

8     walk down.  We're going to walk down.  I know that everyone

9     here will soon be marching over to the Capitol Building to

10    peacefully and patriotically make your voices heard.

11          And you say that you wanted to show your support

12    for and join then-President Trump as he said he would be

13    marching to the Capitol; but, of course, didn't.

14          So, with that factual set of offense conduct

15    circumstances, I look at some of the following pertinent

16    factors in assessing your role in that overall mob activity

17    that had devastating consequences.

18          First, you were in the Capitol Building for about

19    seven minutes or less; two, you did not physically attack

20    any police officer or any other person; three, you did not

21    personally damage any property inside the Capitol; three

22    (sic) -- you did not engage in chanting or slogans, carry

23    posters, signs, or brandish a weapon of any kind to incite

24    others to follow you into the Capitol; you voluntarily

25    turned yourself into the FBI; six, you fully cooperated at

1   the outset, by turning over to law enforcement your devices,

2   your passwords to devices and social media accounts; seven,

3   you had no inflammatory language on social media before,

4   during, or after January 6th, let alone any calls for

5   political violence; eight, you promptly agreed to enter a

6   plea agreement after an offer was extended by the government

7   to accept responsibility in this case; nine, you had no

8   preplanning for this event; it wasn't something that you

9   came to Washington, D.C. -- to break into the Capitol and

10  join the mob, delay the certification of the presidential

11  vote.  You didn't bring any dangerous weapons with you; you

12  didn't even bring any defensive gear to -- as if you were

13  planning for some kind of violent confrontation.

14          You did acknowledge that you knew you shouldn't

15  have entered the Capitol Building.  But the evidence, as I

16  see it, points to a conclusion that this was a defendant who

17  didn't deliberately intend or support the violence and

18  destruction that has left such a dark stain on our

19  democracy.

20          In sum, although the nature of the offense and the

21  need for the sentence to reflect the seriousness of the

22  offense and promote respect for the law would generally

23  favor a custodial sentence, the particular circumstances of

24  this defendant's conduct put him in a less troublesome

25  category than many of the more aggressive rioters that day.

1          Regarding your history and characteristics, you

2     have no criminal history; and you have had a professional

3     life that, to my mind, should and does merit respect.

4          You are an army veteran who has served in combat

5     zones in four wars; as a medical professional, you helped

6     save lives.

7          You acknowledge that you are a well-educated

8     veteran with a distinguished career in the military; and you

9     should have known better.  Your lawyer says that you know

10    that you are going to have an asterisk next to your military

11    service and all of your many, many awards; and you will.

12         Perhaps the government, in seeking an

13    incarcerative period here wants to use you as an example to

14    other people in the military with the specialized training

15    you get to focus outside this country but not on Americans

16    that that specialized training, when turned on Americans and

17    at the heart of our democracy, has got to be punished with

18    jail time; and I get that.

19         But for the individual standing here before me

20    today who has recognized that his conduct contributed -- and

21    I quote from his defense memo:  Contributed to an

22    insurrection and the peaceful transfer of power, two

23    democratic tenets that you repeatedly risked your life for

24    over 28 years to defend -- I think you recognize that this

25    was a grave mistake and are doing your work now,

1   particularly by talking to members of Congress on the Select

2   Committee to help deter other people with the specialized

3   training you received in the military not to turn it against

4   their fellow Americans.

5            I have to say that it does strike me that your

6   better judgment seemed to have returned to you almost

7   immediately after January 6th because, in the days that

8   followed, you did voluntarily surrender to law enforcement.

9   You initiated discussions almost immediately after your

10  friend was arrested with no prompting from friends or

11  family, it appears, to figure out how to surrender on your

12  own.

13           You have shown sincere remorse in your letters to

14  the Court.  You have cooperated extensively with law

15  enforcement by turning over your phone, your computer, your

16  hard drive with all relevant passwords.  And although the

17  government calls it obstruction that you did delete photos

18  from your phone that you took on January 6th, I credit that

19  you did so in response to feelings of being ashamed by what

20  had happened and that you were there to participate in the

21  actions of the mob.

22           Far from shying away from what Mr. Gruppo himself

23  has called a life-altering mistake, you have been very

24  blunt, up front, about your own embarrassment and

25  humiliation and your shame about your criminal conduct which

1    you have detailed, it seems, quite honestly.

2            Unlike other January 6th defendants, you didn't

3    boast about your presence at the Capitol Building on social

4    media or in the news.  You haven't advocated as others who

5    the government has recommended probationary sentences for;

6    you haven't recommended that there be some overturning of

7    the legitimate electoral process.

8            You have expressed -- and I appreciate this -- you

9    have expressed -- one of the few defendants that I have seen

10   in these cases -- an apology to your countrymen, to

11   President Biden, President Trump, Vice President Pence,

12   Vice President Harris, Speaker Pelosi, and our other

13   congressional leaders for your actions on January 6th -- and

14   they do deserve an apology.

15           One of the things that struck me in your letter is

16   that you say that one thing you have done as a result of

17   this experience is to renew your commitment to the basic

18   teachings from your Catholic school education, including the

19   biblical command that you shall love your neighbor as

20   yourself.  And it did strike me that, in these politically

21   divisive times, that maybe we should all take time to

22   remember we are all Americans and we should avoid demonizing

23   people with different political views.

24           As to the need for the sentence imposed to deter

25   criminal behavior and protect the public from further crimes

1   of the defendant, these are very critical considerations for

2   a sentencing judge.  The seriousness of the criminal conduct

3   we witnessed on January 6th only highlights the need for

4   deterrence in the form of a sufficient sentence to deter the

5   defendant and others from engaging in this kind of conduct

6   in the future.

7           I do not find, however, the need for specific

8   deterrence for this defendant in light of his lack of any

9   criminal history, his lack of any violent conduct, or any,

10  even, property damage caused by him during the offense

11  conduct; the lack of any promotion of his criminal activity;

12  the lack of any planning to engage in any violent activity

13  on January 6th; as well as his early acceptance of

14  responsibility, his extensive cooperation, and the

15  financial, professional, and social consequences that have

16  already befallen him due to his actions on January 6th.

17          Regarding the types of sentences available, the

18  defendant is now convicted of a petty offense, Class B

19  misdemeanor, so he faces a maximum term of imprisonment of

20  six months, and up to five years' probation.

21          Regarding the need to avoid unwarranted sentencing

22  disparity, the defendant has raised the fact that other

23  January 6th defendants charged with petty offense

24  misdemeanors have received probationary sentences, and

25  suggests that a custodial sentence here would be an

1    unwarranted sentencing disparity; I do agree.

2            I do recognize that a range of sentences, both

3    probationary and custodial, have been imposed on January 6th

4    defendants convicted of this petty offense misdemeanor; but

5    given the specific offense conduct of Mr. Gruppo, the Court

6    finds that a sentence of probation with home detention would

7    be appropriate here.

8            Based on my consideration of these and other

9    factors, I will now state the sentence to be imposed.

10           Pursuant to the Sentencing Reform Act of 1984, and

11   in consideration of the provisions of 18 U.S.C. Section

12   3553, it is the judgment of the Court that you, Leonard

13   Gruppo, are hereby sentenced to a term of 24 months, two

14   years of probation, as to Count 4 of the indictment.

15           In addition, you are ordered to pay a special

16   assessment of $10, in accordance with 18 U.S.C.

17   Section 3013.

18           The Court authorizes that supervision and

19   jurisdiction of this case be transferred to the United

20   States District Court for the Northern District of Texas.

21   While on supervision, you shall abide by the following

22   mandatory conditions, as well as the standard conditions of

23   supervision which are imposed to establish the basic

24   expectations for your conduct while on supervision.

25           The mandatory conditions include:  One, you must

1    not commit another federal, state, or local crime; two, you

2    must not unlawfully possess a controlled substance; three,

3    the mandatory drug testing condition is suspended based on

4    the Court's determination that you pose a low risk of future

5    substance abuse.  Four, you must make restitution in

6    accordance with 18 U.S.C. Section 3663, or any other statute

7    authorizing a sentence of restitution.

8         You shall comply with the following special

9    conditions:  You are ordered to make restitution to the

10   Architect of the Capitol in the amount of $500.  The Court

11   determines you do not have the ability to pay interest and,

12   therefore, waives any interest or penalties that may accrue

13   on the balance.  You must pay the balance of any restitution

14   owed at a rate of no less than $100 each month.

15        You are ordered, also, to pay a fine in the amount

16   of $3,000.  The Court determines you do not have the ability

17   to pay interest and, therefore, waives any interest or

18   penalties that may accrue on the balance.

19        You must pay the financial penalty in accordance

20   with the schedule of payments sheet of the judgment.  You

21   must also notify the Court of any changes in economic

22   circumstances that might affect the ability to pay this

23   financial penalty.

24        Having assessed the defendant's ability to pay,

25   payment of the total criminal monitoring penalties is due as

1    follows:  Payment in equal monthly installments of $125 over

2    a period of 24 months to commence after the date of this

3    judgment.  You must provide the probation officer access to

4    any requested financial information and authorize the

5    release of any financial information until the restitution

6    obligation is paid in full.  The probation office may share

7    financial information with the U.S. Attorney's Office.

8         You must not incur any credit charges or open

9    additional lines of credit without the approval of the

10   probation officer.

11        Restitution payments shall be made to the Clerk of

12   the Court for the U.S. District Court, District of Columbia,

13   for disbursement to the following victim, in the amount of

14   $500, Architect of the Capitol, Office of the Chief

15   Financial Officer, attention Kathy Sherill, CPA, Ford House

16   Office Building, Room H2-205B, Washington, D.C. 20515.

17        The financial obligations are immediately payable

18   to the Clerk of the Court for the U.S. District Court, 333

19   Constitution Avenue, NW, Washington, D.C. 20001.  Within 30

20   days of any change of address, you shall notify the Clerk of

21   the Court of the change until such time as the financial

22   obligation is paid in full.

23        The probation office shall release the presentence

24   investigation report to all appropriate agencies, which

25   includes the U.S. Probation Office in the approved district

1    of residence in order to execute the sentence of the Court.

2              Treatment agencies shall return the presentence

3    report to the probation office upon the defendant's

4    completion or termination from treatment.

5              Pursuant to 18 U.S.C. Section 3742, you have a

6    right to appeal the sentence imposed by the Court if the

7    period of imprisonment is longer than the statutory maximum

8    or the sentence departs upward from the applicable

9    sentencing guideline range -- which there is no range here.

10   If you choose to appeal, you must file any appeal within 14

11   days after the Court enters judgment.

12             As defined in 28 U.S.C. Section 2255, you also

13   have the right to challenge the convictions entered or

14   sentence imposed if new and currently unavailable

15   information becomes available to you or on a claim you

16   received ineffective assistance of counsel in entering a

17   plea of guilty to the offense of conviction or in connection

18   with sentencing.  If you are unable to afford the cost of an

19   appeal, you may request permission from the Court to file an

20   appeal without cost to you.

21             Are there any objections to the sentence imposed

22   not already noted on the record from the government?

23             MS. MIRELL:  No.

24             Your Honor, I just wanted to -- you did not -- I

25   believe I heard you say probation with home detention, but I

1    haven't heard any home detention condition.  But if the --

2              THE COURT:  You are right in that.  There is.

3    Thank you.

4              Location monitoring.  You will be monitored by a

5    form of location monitoring technology indicated here for a

6    period of 90 days, and you must follow the rules and

7    regulations of the location monitoring program.  The cost of

8    the program is waived.

9              Location monitoring technology is at the

10   discretion of the probation officer, including radio

11   frequency monitoring, GPS monitoring, including hybrid GPS,

12   Smartlink, or voice recognition.

13             This form of location monitoring technology will

14   be used to monitor the following restrictions on your

15   movement in the community.  You are restricted to your

16   residence at all times, except for employment, education,

17   religious services, medical, substance abuse, or mental

18   health treatment, attorney visits, court appearances,

19   court-ordered obligations, or other activities as

20   preapproved by the officer.  Home detention.

21             Thank you.

22             MR. LINDSEY:  How long was that, Judge?

23             THE COURT:  90 days.  All right.

24             And they will -- I am going to transfer

25   jurisdiction to --

1            MR. LINDSEY:  Actually, he resides in Dallas; he's

2     working at a clinic there.

3            THE COURT:  Yes.  The probation office has already

4     arranged for transfer of jurisdiction to Dallas, Texas; and

5     so they will take care of the location monitoring technology

6     for the 90 days of home detention.

7            All right.  You may be seated.

8            Does the government have any motion to dismiss

9     open counts in the indictment or the information?

10           MS. MIRELL:  Yes, Your Honor.

11           At this time, the government moves to dismiss

12     Counts 1 through 3 of the information.

13           THE COURT:  That motion is granted.

14           Anything else to consider today from the

15     government?

16           MS. MIRELL:  Nothing further, Your Honor.

17           THE COURT:  And from the defense?

18           MR. LINDSEY:  No, Judge.  Thank you.

19           THE COURT:  All right.  You are all excused.

20           PROBATION OFFICER:  Your Honor, just like with

21     yesterday, it's okay to put him on the bracelet -- I just

22     want your permission to give him a few days to get settled.

23           THE COURT:  Yes.  I will do that.

24           And I am going to sign the transfer of

25     jurisdiction right now.

1          THE DEFENDANT:  Thank you, Your Honor.

2          THE COURT:  Thank you.

3          MR. LINDSEY:  Just to be clear, he is going to

4    work while he is on the --

5          THE COURT:  Correct.

6          MR. LINDSEY:  Okay.  Thank you.

7          (Whereupon, the proceeding concludes, 11:07 a.m.)

8                         * * * * *

9                        **CERTIFICATE**

10

11          I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby

12    certify that the foregoing constitutes a true and accurate

13    transcript of my stenographic notes, and is a full, true,

14    and complete transcript of the proceedings to the best of my

15    ability.

16

17          This certificate shall be considered null and void

18    if the transcript is disassembled and/or photocopied in any

19    manner by any party without authorization of the signatory

20    below.

21

22

          Dated this 2nd day of November, 2021.
23
          /s/ Elizabeth Saint-Loth, RPR, FCRR
24        Official Court Reporter

25